05-6546-cv (L)
Gorman v. The Consol. Edison Corp.

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2006

(Argued: February 15, 2007        Decided: May 30, 2007)

Docket Nos. 05-6546-cv; 06-2241-cv

- - - - - - - - - - - - - - - - - - - - -x

JAMES H. GORMAN, JR. et al.,

Plaintiffs-Appellants,

EDGARDO CARBALLO, CRAIG M. CUVELIER,
FREDERICK J. GALBRAITH, ROBERT VETERAMO,
RICHARD P. JONES, JAMES M. CILLO,

Plaintiffs,

-v.-

THE CONSOLIDATED EDISON CORPORATION,

Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - - -x

JAMES H. GORMAN, JR. et al.,

Plaintiffs-Appellants,

-v.-

ENTERGY NUCLEAR OPERATIONS, INC.,

Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - - -x

1

Before:      JACOBS, <u>Chief Judge</u>, CALABRESI, <u>Circuit Judge</u>, and BERMAN, <u>District Judge</u>.<sup>*</sup>

Consolidated appeals from judgments of the United States District Court for the Southern District of New York (McMahon, <u>J.</u> and Robinson, <u>J.</u>) dismissing claims asserted under the Fair Labor Standards Act and New York Labor Law, by employees seeking payment of wages for activities incident to the start and end of the work day.

Affirmed.

> JOSEPH P. CAREY, Joseph P. Carey, P.C., Fishkill, New York (Annette G. Hasapidis, Law Offices of Annette G. Hasapidis, South Salem, New York, <u>on the brief</u>), <u>for Plaintiffs-Appellants</u>.
>
> DAVID J. REILLY (Mary K. Schuette, Eva L. Martinez, Barbara Jane Carey, <u>on the brief</u>), Consolidated Edison Company of New York, Inc., Law Department, New York, New York, <u>for Defendant-Appellee The Consolidated Edison Corporation</u>.
>
> JONATHAN M. KOZAK (Joseph M. Martin, <u>on the brief</u>), Jackson Lewis LLP, White Plains, New York, <u>for Defendant-Appellee Entergy Nuclear Operations, Inc.</u>

---

<sup>*</sup> The Honorable Richard M. Berman, of the United States District Court for the Southern District of New York, sitting by designation.

2

DENNIS JACOBS, <u>Chief Judge</u>:

In these consolidated appeals under the Fair Labor Standards Act ("FLSA"), employees of a nuclear power station sue their present and former employers (variously) challenging computation of overtime and seeking payment of wages for the time it takes for security-related procedures at ingress to the plant, for suiting up, for some intervening steps, and for the same in reverse. FLSA, 29 U.S.C. § 201 <u>et seq.</u>, as amended by the Portal-to-Portal Act, 61 Stat. 86-87 (codified at 29 U.S.C. § 254(a)). The plaintiffs work at the Indian Point II nuclear power plant ("Indian Point" or "the plant"), which was owned and operated by defendant Consolidated Edison Company of New York, Inc. ("Con Ed"), and was sold in September 2001 to defendant Entergy Nuclear Operations, Inc. ("Entergy").

In the action against Con Ed, plaintiffs claim that the method of calculating the hourly overtime rate inadequately accounts for the premium paid to those who work the nightshifts. The United States District Court for the Southern District of New York (McMahon, <u>J.</u>) dismissed, and plaintiffs moved for leave to file an amended complaint. The proposed amended complaint asserted the different and

3

distinct FLSA claim to be paid wages for time spent in security procedures and in "donning and doffing" required protective gear (to use the term of art). Judge McMahon denied the motion for leave to amend as futile.

The suit against Entergy asserted claims which were substantially similar to those in the proposed amended complaint against Con Ed.[1] The district court (Robinson, J.) granted Entergy's motion to dismiss, and denied plaintiffs' motion for leave to amend as futile.

On appeal, each case presents the question whether ingress and egress and donning and doffing are compensable under the FLSA. Also at issue is the propriety of Con Ed's method of calculating plaintiffs' hourly overtime rate. There are also state law claims; but it is stipulated that those claims are controlled by our adjudication of the FLSA claims.

We affirm.

---

[1] Plaintiffs' proposed amended complaint identified no additional activities. As the district court observed, the proposed changes simply "add details about the procedures [plaintiffs are] required to perform [and] do not alter the non-compensable nature of the activities [they] are required to perform before and after work." Gorman v. Entergy, No. 04 Civ. 8484 (S.D.N.Y. filed Apr. 17, 2006).

4

## I

The FLSA, 29 U.S.C. § 201 et seq., was enacted to ensure that employees receive a "fair day's pay for a fair day's work," Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 578 (1942) (quoting 81 Cong. Rec. 4983 (1937) (message of President Franklin D. Roosevelt)), superseded by statute, Portal-to-Portal Act, 61 Stat. 86-87, as recognized in Trans World Airlines v. Thurston, 469 U.S. 111, 128 n.22 (1985). On the pay end, the FLSA "guarantee[s] compensation for all work or employment engaged in by employees covered by the Act." Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 602-03 (1944). But not all work-related activities constitute "work or employment" that must be compensated. Kavanagh v. Grand Union Co., Inc., 192 F.3d 269, 271-72 (2d Cir. 1999).

In a short-lived 1946 holding, the Supreme Court construed the FLSA to require pay for the time employees spent walking on the employer's premises before clocking in, and for donning and doffing aprons and overalls. Anderson v. Mount Clemens Pottery Co., 328 U.S. 680, 691-93 (1946), superseded by statute, Portal-to-Portal Act, 61 Stat. 86-87, as recognized in Reich v. N.Y. City Transit Auth., 45 F.3d

646, 649 (2d Cir. 1995).  In 1947, the Portal-to-Portal Act

created two exceptions from FLSA-mandated compensation:

> (1) walking, riding, or traveling to and from
> the actual place of performance of the
> principal activity or activities which such
> employee is employed to perform, and
>
> (2) activities which are preliminary to or
> postliminary to said principal activity or
> activities,
>
> which occur either prior to the time on any
> particular workday at which such employee
> commences, or subsequent to the time on any
> particular workday at which he ceases, such
> principal activity or activities.

29 U.S.C. § 254(a).  Each of the two subsections bears upon

plaintiffs' claims.

Under subsection (1), no pay is required for travel to

and from the place where the employee performs his

"principal activities"; the FLSA regulations define

"principal activities" as those "which the employee is

employed to perform."  29 C.F.R. § 790.8(a) (internal

quotation marks omitted).  Subsection (2) of the Portal-to-

Portal Act undid the Anderson holding that required

compensation for putting on aprons and overalls, and thus

"was intended to relieve employers from liability for

preliminaries, most of them relatively effortless, that were

thought to fall outside the conventional expectations and

6

customs of compensation." N.Y. City Transit Auth., 45 F.3d at 649. A substantial body of case law discusses subsection (2)'s distinction between (on the one hand) preliminary and postliminary activities and (on the other) the principal activities of employment; but the distinction remains elusive in application.

Nine years after the Portal-to-Portal Act, the Supreme Court considered whether changing clothes and showering were among the principal work activities for workers at a battery plant who "must make extensive use of dangerously caustic and toxic materials, and are compelled by circumstances, including vital considerations of health and hygiene, to change clothes and to shower." Steiner v. Mitchell, 350 U.S. 247, 248 (1956). After allowing that preliminary and postliminary "changing clothes and showering under normal conditions" were indisputably non-compensable, id. at 249, the Court described the highly corrosive and toxic substances that permeate the battery plant, and ruled that:

> activities performed either before or after the regular work shift . . . are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by [subsection 1 of the Portal-to-Portal Act].

7

Id. at 256 (emphasis added).  Thus, after Steiner, activities that are "integral and indispensable" to principal activities are compensable under the FLSA (as well as the principal activities themselves).

On the same day Steiner issued, the Supreme Court decided a slaughterhouse case, holding that knife-sharpening is "an integral part of and indispensable to the various butchering activities for which [the workers] were principally employed."  Mitchell v. King Packing Co., 350 U.S. 260, 263 (1956).  The Mitchell Court shed light on the meaning of "integral" (as used in Steiner):  sharpening knives is both indispensable to the task of butchering animals, and intrinsically "connected with" it.  Id. at 262. The Court cited the testimony of a supervisor to the effect that "a dull knife would slow down production . . . , affect the appearance of the meat as well as the quality of the hides, cause waste and make for accidents; 'that a knife to be of any practical value in a knife job has to be sharp.'" Id. (ellipses omitted).

In a more recent case, IBP v. Alvarez, the parties left uncontested the finding that the donning and doffing of "unique protective gear" constitute "principal activities";

8

at issue in the Supreme Court was:  whether employees must be paid for time waiting to enter the locker room, time in transit from the locker room to the job-site, and time in transit back to the locker room.  546 U.S. 21, 29-30, 39-40 (2005).

The Court first held that "any activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under . . . the Portal-to-Portal Act."  Id. at 37.  Since it was uncontested that the specialized protective gear was "integral and indispensable" under Steiner, the donning and doffing was itself a "principal activity."  And because employees are paid for a continuous workday--which begins with the first principal activity and ends with the last--the Portal-to-Portal Act has no application once the workday has begun.  Id. at 28-29 (citing 29 C.F.R. § 790.6(a)).  Therefore, "during a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is [compensable]."  Id. at 37.

Nevertheless, the Court held that awaiting the first principal activity of the workday is not itself a principal

9

activity, id. at 40; it cited 29 C.F.R. § 790.7(g), which "characterizes the time that employees must spend waiting to check in . . . as generally a 'preliminary' activity covered by the Portal-to-Portal Act." Id. at 41-42. As the Court emphasized, "the fact that certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable' to a 'principal activity' under Steiner." Id. at 40-41.

## II

Before the Indian Point employees can perform the tasks for which they were hired, they spend between ten and thirty minutes a day passing through multiple layers of security and suiting up. Am. Compl. ¶ 19. The question is whether these activities are "'integral and indispensable' to a 'principal activity' under Steiner," IBP, 546 U.S. at 39-40, and therefore (under IBP) principal activities in themselves. If so, they are compensable under the FLSA.

We review de novo a district court's grant of a motion to dismiss under Rule 12(b)(6). E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 28 (2d Cir. 2006). For the

10

purpose of such a review, this Court must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party. Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002). Generally, we review a district court's denial of a motion to amend under the abuse of discretion standard. Commander Oil Corp. v. Barlo Equip. Corp., 215 F.3d 321, 333 (2d Cir. 2000). "However, if the denial of leave to amend is based upon a legal interpretation . . . we review [it] de novo." Littlejohn v. Artuz, 271 F.3d 360, 362 (2d Cir. 2001) (per curiam). Here, each district judge denied the motions for leave to amend as futile based on their interpretation of the FLSA; so we review those denials de novo.

Paragraph 15 of the amended complaint against Entergy (which is substantially similar to the proposed amended complaint against Con Ed, see n.1, supra) specifies the activities for which pay is sought:

(i) Waiting in traffic outside the plant
entrance;

(ii) Badge inspection at the entrance,
including a visual check of the interior of the

11

car, and occasional random vehicle inspection (engine, trunk, glove compartment, undercarriage);

(iii) Parking and walking to the command post;

(iv) At the command post, waiting in line and passing through a radiation detector, x-ray machine, and explosive material detector;

(v) Waiting in line to swipe an ID badge and to palm a sensor;

(vi) Going to the locker room to obtain and don metal capped safety boots, safety glasses, and a helmet (if applicable);

(vii) Walking to the job-site;

(viii) And at the end of the shift, doing many of these things in reverse.[2]

Am. Compl. ¶ 15.

Plaintiffs' contention that these activities are "integral and indispensable to the performance of [their] principal activities,"[3] Am. Compl. ¶ 15, relies chiefly on

---

[2] The egress radiation-test is apparently more sensitive and takes more time.

[3] The pleadings (and the proposed amended pleadings) omit plaintiffs' particular responsibilities; but plaintiffs' counsel said at argument that plaintiffs work in chemical applications, radiology, maintenance and the

12

the idea that they are "indispensable" or required--without accounting for Steiner's requirement that they be "integral" as well.  Steiner, 350 U.S. at 256.

"Indispensable" is not synonymous with "integral." "Indispensable" means "necessary."  See Webster's Third New Int'l Dictionary (Unabridged) 1152, 1510-11 (1986). "Integral" means, inter alia, "essential to completeness"; "organically joined or linked"; "composed of constituent parts making a whole."  Id. at 1173.  At the same time, "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary." Cabell v. Markham, 148 F.2d 737, 739 (2d Cir. 1945).  The caselaw gives better guidance by apt examples:  Sharpening the knife is integral to carving a carcass, Mitchell, 350 U.S. at 263; powering up and testing an x-ray machine is integral to taking x-rays, Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 717-18 (2d Cir. 2001); and feeding, training and walking the dog is integral to the work of a K-9 officer, Reich v. N.Y. City Transit Auth., 45 F.3d 646 (2d Cir. 1995), limited in part by IBP, 546 U.S. at 21.  See also IBP, 546 U.S. at 40-41 (observing that

---

control room.

13

activities which are "necessary" (or indispensable) to a principal activity are not thereby "integral and indispensable"); 29 C.F.R. § 790.7(d) (noting, for example, that "the carrying by a logger of a portable power saw or other heavy equipment (as distinguished from ordinary hand tools) on his trip into the woods to the cutting area . . . is not segregable from the simultaneous performance of his assigned work" and is thus integral to his principal activities) (emphasis added).

Steiner is in one sense the most apt analog, dealing as it does with donning and doffing gear that protects against workplace dangers that transcend ordinary risks. At issue in Steiner was exposure to corrosive and toxic substances that permeated a battery plant; at issue here is the security of a nuclear power plant. The analogy is, however, unsustainable. The Steiner opinion invites a narrow interpretation: "[I]t would be difficult to conjure up an instance where changing clothes and showering are more clearly an integral and indispensable part of the principal activity of the employment than in the case of these employees." 350 U.S. at 256. Without the taking of the measures required, the environment of the battery plant

14

could not sustain life--given the toxic substances in liquid, solid, powder and vapor form (and in the dust of the air) that "permeate[d] the entire [battery] plant and everything and everyone in it." Id. at 249, 250. Steiner therefore supports the view that when work is done in a lethal atmosphere, the measures that allow entry and immersion into the destructive element may be integral to all work done there, just as a diver's donning of wetsuit, oxygen tank and mouthpiece may be integral to the work even though it is not the (underwater) task that the employer wishes done.

By contrast, the activities for which plaintiffs here seek compensation, while arguably indispensable, are not integral to their principal activities.[4]

A. Ingress and Egress Security Procedures

The activities required to enter and exit Indian Point--from waiting in line at the vehicle entrance through the final card-swipe and handprint analysis--are necessary in

_____

[4] In the nuclear containment area--which more closely resembles the battery plant--Indian Point employees wore specialized gear and dosimeters, and were compensated for donning and doffing.

15

the sense that they are required and serve essential purposes of security; but they are not integral to principal work activities. These security-related activities are modern paradigms of the preliminary and postliminary activities described in the Portal-to-Portal Act, in particular, travel time. The plain wording of subsection (1) of the Portal-to-Portal Act exempts from the FLSA: "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform." 29 U.S.C. § 254(a)(1); see also 29 C.F.R. § 790.7(c).[5]

Plaintiffs argue that the Portal-to-Portal Act was enacted when the time-consuming security measures at issue may not have been envisioned, and there is some force to the observation that security measures at sensitive facilities (and elsewhere) are becoming increasingly invasive, layered and time-consuming. But the text of the statute does not depend on the purpose of any preliminaries, or how much time such preliminaries may consume. Travel time was held to be

---

[5] Rules may yield to particular instances. For example, passing through preliminary security procedures may be integral to the principal activity of an employee responsible for monitoring, testing and reporting on the plant's infrastructure security.

16

"normal" (and therefore outside the FLSA) in <u>Kavanagh v. Grand Union Co., Inc.</u>, even though the plaintiff (who performed mechanical services in defendant's supermarkets) commuted five to nine hours a day depending on the supermarkets to which he was dispatched. 192 F.3d 269, 272-73 (2d Cir. 1999). Normal travel time "does not represent an objective standard of how far most workers commute or how far they may reasonably be expected to commute. Instead, it represents a subjective standard, defined by what is usual within the confines of a particular employment relationship." <u>Id.</u> at 272. By the same token, security measures that are rigorous and that lengthen the trip to the job-site do not thereby become principal activities of the employment. At Indian Point, this is easily demonstrated because the security measures at entry are required (to one degree or another) for everyone entering the plant-- regardless of what an employee does (servicing fuel rods or making canteen sandwiches)--and including visitors. <u>See</u> <u>Gorman v. Entergy</u>, No. 04 Civ. 8484 (S.D.N.Y. filed Apr. 17, 2006) (citing plaintiffs' memorandum in opposition to defendant's motion to dismiss).

17

B.  Donning and Doffing of Protective Gear

Similarly, a helmet, safety glasses, and steel-toed boots may be indispensable to plaintiffs' principal activities without being integral.[6]  The donning and doffing of such generic protective gear is not different in kind from "changing clothes and showering under normal conditions," which, under Steiner, are not covered by the FLSA.  350 U.S. at 249.  Among the activities classified in the regulations as preliminary and postliminary are "checking in and out and waiting in line to do so, changing clothes, washing up or showering, and waiting in line to receive pay checks."  29 C.F.R. § 790.7(g) (emphasis added).  The donning and doffing of generic protective gear is not rendered integral by being required by the employer or by government regulation.  See Reich v. IBP, Inc., 38 F.3d 1123, 1126 (10th Cir. 1994) (holding that donning and doffing safety glasses, a pair of earplugs, a hard hat and safety shoes, "although essential to the job, and required by the employer," are pre- and postliminary activities);

---

[6] At argument, plaintiffs' counsel conceded that the protective gear listed in the complaint (helmets, safety glasses, and steel-toed shoes) were the only protective gear that plaintiffs were required to wear; if given the opportunity to re-plead, counsel would not supplement.

Anderson v. Pilgrim's Pride Corp., 147 F. Supp. 2d 556, 563 (E.D. Tex. 2001) (same), aff'd, 44 Fed. Appx. 652 (5th Cir. 2002) (not precedential). But see Alvarez v. IBP, Inc., 339 F.3d 894, 903 (9th Cir. 2003) (observing that the "donning, doffing, and cleaning of non-unique gear (e.g., hardhats) [is] 'integral and indispensable' as that term is defined in Steiner"), aff'd on other grounds, IBP, 546 U.S. at 21. The donning and doffing of a helmet, safety glasses and boots are "relatively effortless," non-compensable, preliminary tasks. N.Y. City Transit Auth., 45 F.3d at 649. And even if the donning and doffing of a helmet, safety glasses and steel-toed boots were "integral and indispensable" to plaintiffs' principal activities, we would be required to

consider whether the time so spent was <u>de minimis</u>.[7]  See <u>id.</u>

---

  [7] As this Court explained in <u>New York City Transit Authority</u>:

> [T]he <u>de minimis</u> doctrine was first articulated by the Supreme Court in <u>Anderson</u> . . . :  "When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. . . . It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved."

45 F.3d at 652 (quoting <u>Anderson</u>, 32 U.S. at 692).  Three factors bear upon the determination of whether the time spent in a particular activity is <u>de minimis</u>: (1) the administrative difficulty of recording the time; (2) the size of the claim in the aggregate; and (3) whether the tasks occur regularly.  <u>Id.</u> (citing <u>Lindow v. United States</u>, 738 F.2d 1057, 1062-63 (9th Cir. 1984)).

  The tasks here are repeated daily and there would be little administrative difficulty in recording them.  As to the size of the potential claim, plaintiffs' counsel was asked at argument: "Is there anything special about these shoes or glasses, or safety caps that takes longer than what we could, in or own experience, know about putting [them] on?"  Counsel responded: "Not to my knowledge."  And counsel acknowledged that these shoes are not somehow more complicated than an ordinary shoe.

  The pleadings would not contradict a conclusion that the time so spent would be <u>de minimis</u>; but we decide this case on the ground that the activities at issue are preliminary and postliminary because that conclusion is more easily arrived at on the pleadings.  Moreover, it is perhaps unclear (after <u>IBP</u>'s continuous workday rule) whether the <u>de minimis</u> test measures only the first integral and indispensable activity of the day, or includes as well all intervening steps that precede the next principal activity of the continuous workday.

20

at 652-53.

*     *     *

Because plaintiffs can prove no set of facts entitling them to compensation for time spent entering and exiting the facility, and donning and doffing a helmet, safety glasses and boots, we affirm the dismissal of plaintiffs' claims against Entergy and the denial by both district judges of leave to amend the complaints.

**III**

Plaintiffs challenge the grant of summary judgment dismissing their overtime-compensation claims against Con Ed.  According to plaintiffs, the method used to calculate the hourly rate for overtime work inadequately accounted for the premium rate paid for nightshifts at the plant.

We review <u>de novo</u> the district court's grant of summary judgment, construing the facts in the light most favorable to the non-moving party.  <u>Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.</u>, 444 F.3d 158, 162 (2d Cir. 2006). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The FLSA generally requires that an employee who works more than forty hours in a given week be paid for the excess time at a rate "not less than one and one-half times the <u>regular rate</u> at which he is employed." 29 U.S.C. § 207(a)(1) (emphasis added). The regular rate is "all remuneration for employment paid to . . . the employee," minus certain exceptions inapplicable here. <u>Id.</u> at § 207(e). As the Supreme Court has explained, it is "the hourly rate actually paid the employee for the normal, non-overtime workweek," and "must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments." <u>Walling v. Youngerman-Reynolds Hardwood Co.</u>, 325 U.S. 419, 424-25 (1945).

The collective bargaining agreement ("CBA") between plaintiffs and Con Ed created a three-tiered compensation structure: (i) "straight" or "basic" time for day shifts, (ii) an 8% premium for the evening shift (between 6:00 p.m. and midnight), and (iii) a 10% premium for the nightshift

22

(between midnight and 7:00 a.m.).  These latter two premiums are collectively referred to as the nightshift differential.

Con Ed argues that the regular rate should be calculated using "a weighted average of the employee's earnings at each rate of pay worked that week (i.e. basic rate, 8% nightshift . . . differential rate, or 10% nightshift differential rate)."  In other words, the regular rate should be derived from the total compensation paid to an employee in a given pay period divided by the number of hours worked; such a calculation naturally encompasses the nightshift differentials, if any, worked by the employee.[8] The plaintiffs contend that "[t]here is no reason to determine a weighted average" because "pursuant to the CBA[, plaintiffs] are employed solely on the basis of a single hourly rate, which is their respective 'regular rate.'"" Plaintiffs argue that this "single hourly rate" should be

_____

[8] The method Con Ed actually uses has more steps, but yields the same result as a more simple weighting calculation.  Con Ed's method (1) calculates how much additional money an employee earned as a result of the nighttime differentials; (2) divides that number by the total number of hours worked in the week; (3) multiplies that number by the number of overtime hours worked in the week; (4) it then divides that number in half (to account for the time-and-a-half); and (5) compensates the employee by that additional increment.

23

the 10% nightshift differential, regardless of the shift actually worked, by virtue of CBA Paragraph 13(b): "Assignment to Work Functions: Any employee assigned to perform any lower or lateral job or function, except pursuant to a demotion, shall receive his regular rate of pay while performing such work."  We fail to see how this, or any other provision of the CBA supports plaintiffs' argument.[9]

This Court has already validated the weighted average method of determining the regular rate, which we described as "properly calculated by adding all of the wages payable for the hours worked at the applicable shift rates and dividing by the total number of hours worked."  Brock v.

---

[9] The clear and unambiguous language of Paragraph 13(b) simply provides that temporary reassignments that pay less will not affect an employee's actual compensation, unless the reassignment was a result of a demotion.  See Duse v. Int'l Bus. Machs. Corp., 252 F.3d 151, 158 (2d Cir. 2001) ("Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms and those terms may be the basis for summary judgment.") (internal citations omitted).  Plaintiffs' argument that the contractual provision establishes a single hourly rate is nonsensical; the CBA expressly provides for at least three rates (straight time, the 8% evening premium, and the 10% night premium).  See Bank Julius Baer & Co. v. Waxfield Ltd., 424 F.3d 278, 283 (2d Cir. 2005) (observing that "canons of construction" forbid contractual interpretations that "lead to absurd results").

24

Wilamowsky, 833 F.2d 11, 14 (2d Cir. 1987); see also id. at 14, 17 (approving the district court's conclusion "that the statutory regular rate was . . . the weighted average hourly rate of all compensation received by the employee").[10]

Moreover, the FLSA regulations expressly approve the weighted average method:

> Where an employee in a single workweek works at two or more different types of work for which different nonovertime rates of pay . . . have been established, his regular rate for that week is the weighted average of such rates. That is, his total earnings (except statutory exclusions) are computed to include his compensation during the workweek from all such rates, and are then divided by the total number of hours worked at all jobs.

29 C.F.R. § 778.115.[11]

---

[10] In Brock, as here, pay for each of three shifts was paid at a different hourly rate. 833 F.2d at 13-14. For overtime, the employer generally paid employees 150% of the day-shift rate (that being the lowest hourly rate paid for non-overtime work). Id. In Brock, we rejected that pay in favor of the weighted average method. Id. at 14.

[11] As plaintiffs observe, the example used in this regulation assumes that the two rates of pay are a result of different jobs, not nighttime differentials. But this observation misapprehends the purpose of the regulation, which is simply to provide an example of a means of calculating the regular rate. See 29 C.F.R. § 778.109 ("The following sections give some examples of the proper method of determining the regular rate of pay in particular instances . . . ." (emphasis added)).

25

Finally, plaintiffs' argument under the CBA succumbs to the rule that "the regular rate of pay cannot be left to a declaration by the parties as to what is to be treated as the regular rate for an employee[;] it must be drawn from what happens under the employment contract."  Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 464 (1948) (emphasis added); see also Walling, 325 U.S. at 424 (observing that the regular rate "is not an arbitrary label chosen by the parties; it is an actual fact"); 29 C.F.R. § 778.109 (same). Because Con Ed's weighted average method adequately accounts for the compensation actually received by employees in calculating the regular rate, we affirm the district court's grant of summary judgment to Con Ed.

\* \* \*

For the foregoing reasons, the judgments of the district courts are affirmed.