Rajkumar SINGH; Thomas S. Matthews, Vivek N. Patil, Trushant Shah, Fredo Joseph and Faramaz Robeny, Plaintiffs,

v.

## The CITY OF NEW YORK, Defendant.

### No. 02 Civ. 3458(PKC).

United States District Court, S.D. New York.

Nov. 29, 2005.

---

Michael J. Andrews, Thomas S. Matthews, Michael J. Andrews P.C., New York City, for Plaintiff.

Michele A. Molfetta, Corporation Counsel, William S.J. Fraenkel, Michael D. Hess Corporation Counsel, New York City, for Defendant.

## *MEMORANDUM AND ORDER*

CASTEL, District Judge.

Plaintiffs are six civilians employed by defendant City of New York as fire alarm inspectors, who allege, *inter alia,* that they have worked overtime without compensation, in violation of the Fair Labor Standards Act of 1938 ("FLSA"), as codified at 29 U.S.C. §§ 201–219. As part of their job, plaintiffs must carry briefcases containing various documents related to site inspections. Plaintiffs allege that carrying these briefcases extends and transforms their commutes from home to work for which they deserve compensation. In addition, plaintiffs allege that the time available to them during their scheduled work hours is insufficient to complete the paperwork associated with those inspections.

Plaintiffs commenced this action on May 6, 2002. The close of discovery was originally set by the Honorable Shira A.

Scheindlin for June 1, 2003. After the case was reassigned to me, I extended the discovery period to on or about March 5, 2004. I further extended discovery on certain matters to April 16, 2004, and subsequently, to May 28, 2004. Discovery has long been closed. Defendant has moved for summary judgment on all of plaintiffs' claims. Plaintiffs oppose defendant's motion and have offered their own motion for summary judgment on the FLSA claim. For the reasons outlined below, defendant's motion is granted in part and denied in part, and plaintiffs' motion is denied in its entirety.

*Facts*

For the purposes of these motions, I have accepted as true plaintiffs' version of the facts and such other facts offered by defendant that are not disputed by plaintiffs. Plaintiffs are currently employed as fire alarm inspectors in the Fire Alarm Inspection Unit ("FAIU") of the Fire Department of New York ("FDNY"), a municipal agency of the City of New York. (Pl. Resp. to Def. 56.1 ¶ 1) Plaintiff Rajkumar Singh has worked as a Supervisor of Electrical Installation in FAIU since August 1991. (Singh Dep. at 19, 32) Plaintiff Thomas Matthews began working in the same position in or around July 1991, and then was promoted to Supervising Inspector in July 2003. (Matthews Dep. at 29–30, 37–38) Plaintiff Vivek Patil began working as a Supervisor of Electrical Installation in August 1991, and plaintiff Trushant Shah began in the same position in February 1994. (Patil Dep. at 13; Shah Dep. at 15) Lastly, plaintiff Fredo Joseph began working as a Fire Protection Inspector in December 1991. (Joseph Dep. at 21)

For all of these plaintiffs, their work requires them to perform fire alarm inspections throughout the five boroughs of New York City. (Brown Dep. at 11–12) At the beginning of most workdays, plaintiffs travel to the first building to be inspected rather than reporting to FAIU headquarters or any other FDNY building. (Singh Dep. at 67; Pl. Dep. Ex. 6; Def. Ex. J) Once they arrive at the inspection site, plaintiffs must report their arrival at the site to FAIU headquarters via telephone. (Singh Dep. at 67; Pl. Dep. Ex. 6) Plaintiffs are required to bring with them several documents pertaining to the inspection site. (Pl. 56.1 ¶¶ 24–25; Brown Dep. at 40–54, 74–75, 81–89, 100–102) After performing an average of five inspections each day, plaintiffs log out at the firehouse nearest to their last inspection site and then travel home with the documents. (Matthews Dep. at 138; Def. Ex. I)

The collective bargaining agreement between plaintiffs and defendant provides that plaintiffs are scheduled to work 35 hours per week. (Singh Dep. at 66–67; Def. Ex. N) The workday begins at 9:00 am and ends at 4:30 pm, with a half-hour break for lunch. (Singh Dep. at 66–67; Pl. Resp. to Def. 56.1 ¶¶ 8, 12) The workweek runs from Monday through Friday. (Pl. 56.1 ¶ 22)

On Fridays during their employment by defendant, plaintiffs have engaged in a different routine. Until approximately one year ago, plaintiffs would perform administrative work at FAIU headquarters on Friday mornings. (Pl. 56.1 ¶ 16; Singh Aff. ¶ 13; Matthews Dep. at 47–48) This work included completing assignments, preparing advanced time sheets, conferencing with supervisors and addressing personnel issues like vacation time. (Pl. 56.1 ¶ 17; Brown Dep. at 73–76). Plaintiffs claim that they only had two to three hours each day to perform these tasks and that the work could only be completed during that time. (Pl. 56.1 ¶¶ 16–17) Plaintiffs further claim that they advised their management that such time was insufficient and that they were working at

home. (Pl. 56.1 ¶¶ 18–209) According to plaintiff Singh, defendant changed its policy approximately one year ago to allow plaintiffs and others similarly situated to complete such administrative work at any point during the week. (Pl. 56.1 ¶ 21; Singh Aff. ¶ 13) Plaintiffs do not appear to argue that this new policy prevents them from completing their administrative work during regular work hours.

Much of this lawsuit centers on the files that plaintiffs pick up on Friday mornings in order to perform inspections for the following week. Plaintiffs receive the files for approximately twenty inspections while at FAIU headquarters on Friday mornings. (Pl. 56.1 ¶ 24) The basis for plaintiffs' claims against defendant lies with their asserted obligation to transport and keep safe the files associated with site-specific inspections. (Pl. 56.1 ¶¶ 30–32; Pl Exs. 6, 8) These files include documents describing the fire alarm history of the buildings to be inspected, various checklists and any available reports and correspondence. (Pl. 56.1 ¶¶ 24–25; Pl. Resp. to Def. 56.1 ¶ 6; Brown Dep. at 40–54, 74–75, 81–89, 100–02) Plaintiffs are required to carry these files to and from work every day, and they maintain that the briefcase and files contained therein can weigh between fifteen and twenty pounds. (Pl. 56.1 ¶¶ 26–27; Singh Dep. at 26, 57) According to plaintiffs, carrying this briefcase prolongs their commute time. (Pl. 56.1 ¶ 104; Singh Dep. at 91) Furthermore, the plaintiffs' obligation to "safeguard" the materials contained in these briefcases has allegedly prevented plaintiffs from attending social events because they must carry the briefcases with them everywhere. (Pl. 56.1 ¶¶ 31, 107–10)

On June 16, 2000, plaintiff Singh wrote to then-FAIU manager Henry Gittlitz to inform him that he would no longer carry what he characterized as "important sensitive official papers / inspectional materials" to and from his home. (Pl.Dep.Ex. 5) Singh explained that his decision was "due to personal reasons and family circumstances" and "for reasons of [the] safety and security of those materials." (Pl.Dep. Ex. 5) In response, Gittlitz wrote a memorandum to Singh dated June 20, 2000, directing Singh to continue beginning and ending his work day in the field and to "safeguard all Fire Department property & materials assigned to you & /or in your possession." (Pl.Dep.Ex. 6) Gittlitz also threatened disciplinary action if Singh failed to comply with his directive. (Pl. Dep.Ex. 6)

Eventually, Singh wrote to the Chief of Fire Prevention and the Deputy Chief Inspector to voice his concerns. (Pl.Dep.Ex. 9–10) Other plaintiffs lodged similar complaints. (Pl.Dep.Ex. 10, 12) On Monday, April 2, 2001, plaintiff Singh went to his first inspection site without any inspection papers and then called FAIU headquarters to inform them of this fact. (Singh Dep. at 220–21; Singh Aff. ¶¶ 7, 10) Gittlitz wrote a memorandum to Singh informing him that his behavior amounted to a dereliction of duty and that any repetition would result in administrative charges against him. (Pl.Dep.Ex. 30)

Singh and other plaintiffs continued to voice their complaints. (Pl. 56.1 ¶¶ 71–73) In June 2001, Singh wrote on his time sheets that he began and ended his work day at home. (Pl. 56.1 ¶ 78; Singh Aff. ¶ 9) Deputy Chief Inspector Barrington Brown wrote another memorandum to Singh directing him not to fill out his time sheets in this manner, and noting that "administrative & criminal charges" might be forthcoming. (Pl.Dep.Ex. 17)

On July 13, 2001, Singh was suspended for thirty days without pay. (Pl.Dep.Ex. 31) Although plaintiffs contend that no charges were filed against Singh nor was he provided a hearing, the FDNY provided

Singh on August 15, 2001, with a memorandum entitled "Notice of Settlement Conference", which detailed five charges against him and set a conference date. (Pl. 56.1 ¶¶ 84–85; Pl. Dep. Ex. 33) On November 26, 2001, Singh attended this internal and informal mediation conference accompanied by a union representative to discuss the charges with Assistant Commissioner Stephen Gregory. (Pl.Dep.Ex. 38) After this conference, the FDNY refused to drop the disciplinary charges against Singh. (Pl.Dep.Ex. 38) In the memorandum explaining its decision, the FDNY informed Singh that he could either proceed with a formal hearing or utilize the grievance mechanism contained in the collective bargaining agreement. (Pl.Dep. Ex. 38) Plaintiff claims that he sought a hearing and did not seek to use the grievance mechanism through his union, but the record contains no evidence to support this assertion. (Singh Dep. at 137–38, 141)

Each of the six plaintiffs now seeks compensation for four hours for every inspection day worked while employed as an inspector by defendant. (Pl. Mem. of Law in Opp'n at 2) Plaintiff Singh alone also claims that that defendant engaged in unlawful retaliation and violated his free speech rights, as protected by the United States Constitution and the New York Constitution. (Second Am. Compl. ("SAC") ¶¶ 109–12) On November 14, 2002, while this case was pending before Honorable Shira A. Scheindlin, defendant moved to dismissed the complaint. (Docket Entry, No. 8) On August 25, 2003, Judge Scheindlin denied this motion. (Docket Entry, No. 17) On November 12, 2003, the case was reassigned to the undersigned. (Docket Entry, No. 21) Defendant has moved for summary judgment on all of these claims, and plaintiffs oppose defendant's motion and have offered their own motion for summary judgment on the FLSA claim.

*Summary Judgment Standard*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law ..." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir.2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e). In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The Court must "view the evidence in the

light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quotations and citations omitted); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. Fed.R.Civ.P. 56(c). In the absence of any disputed material fact, summary judgment is appropriate. *Id.* When cross-motions for summary judgment are made, the standard is the same as that for an individual motion. *See Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir.2001).

*Discussion*

## I. The Fair Labor Standards Act

The purpose of the FLSA is to "guarantee[ ] compensation for all work or employment engaged in by employees covered by the Act." *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 602, 64 S.Ct. 698, 88 L.Ed. 949 (1944). Specifically, the FLSA requires that most workers receive minimum wage and overtime compensation for hours worked in excess of forty per week. *See Coke v. Long Island Care at Home, Ltd.,* 376 F.3d 118, 123 (2d Cir.2004) (citing 29 U.S.C. § 201 et seq.). Overtime compensation is paid at one and one-half times the employee's "regular rate". *See Bongat v. Fairview Nursing Care Ctr., Inc.,* 341 F.Supp.2d 181, 184 (E.D.N.Y.2004) (citing 29 U.S.C. § 207(a)(1)). However, Congress did not define what constituted "work" or "employment" for purposes of the FLSA and its overtime compensation provision. *See Reich v. New York City Transit Auth.,* 45 F.3d 646, 649 (2d Cir.1995) (reviewing the history of the FLSA).

In the context of the FLSA, the Supreme Court interpreted the terms "work" and "employment" broadly in *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). The Court construed the FLSA to require compensation for such activities as walking from the factory gate to the workbench, and changing into work clothes. *Id.* at 692–93, 66 S.Ct. 1187. However, the Court also recognized what has become known as the de minimis doctrine. Under this doctrine, "[i]t is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved." *Id.* at 692, 66 S.Ct. 1187. When the activity involves only minimal additional time beyond scheduled working hours, courts should disregard "such trifles" and not award compensation. *Id.*

█ Shortly after *Anderson,* Congress enacted the Portal–to–Portal Act ("PPA") to specify two categories of activities that do not constitute work for purposes of the FLSA:

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a). Thus, merely traveling to and from work and activities purely preliminary to the employee's "principal activity or activities" are not compensable work. *See Kavanagh v. Grand Union Co.,*

*Inc.*, 192 F.3d 269, 272–73 (2d Cir.1999) (collecting cases from other circuits).

■■■ "[P]rincipal activity or activities" are compensable, and the Supreme Court has interpreted the phrase to include the dressing, undressing and changing clothes of workers at an electric battery plant. *See Steiner v. Mitchell*, 350 U.S. 247, 256, 76 S.Ct. 330, 100 L.Ed. 267 (1956). Such activities were an "integral and indispensable part of the principal activities for which covered workmen [were] employed." *Id. See also Mitchell v. King Packing Co.*, 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282 (1956) (holding that butchers' knife-sharpening performed before and after work shift constituted "principal activities" for purposes of section 254(a)). Recently, the Supreme Court held that employees' walking between a locker room—where they "donned" protective gear at the beginning of the work day and "doffed" such gear at the end—and their work stations was "integral and indispensable" to the principal activities that occurred at the work station, and thus was compensable under the FLSA. *See IBP, Inc. v. Alvarez*, —— U.S. ——, —— – ——, 126 S.Ct. 514, 521–22, 163 L.Ed.2d 288 (2005). However, time spent waiting to dress in protective gear is not "integral and indispensable" and thus not compensable. *Id.* at 526–27. The mere fact that an activity is "necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable' to a 'principal activity' under *Steiner*." *Id.*

■■■ The Supreme Court has recognized that "FLSA claims typically involve complex mixed questions of fact and law ...". *Barrentine v. Arkansas–Best Freight System*, 450 U.S. 728, 743, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), *overruled on other grounds*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). In the Second Circuit, "the trial judge [is] responsible for determining as a matter of law whether plaintiff's activities could potentially constitute 'work.'" *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 521 (2d Cir.1998), *cert. denied*, 525 U.S. 1055, 119 S.Ct. 619, 142 L.Ed.2d 558 (1998). After the court defines "work" as a matter of law, the fact finder determines "not only how much of plaintiff's time ... [falls] within the court's definition of 'work' and would be compensable, but also how much of that time was spent with the employers actual or constructive knowledge." *Id.* If a court determines that the activity at issue constitutes "work", an employee in the Second Circuit is only entitled to compensation for those hours of work performed of which the employer had actual or constructive knowledge. *Id.* at 524 (adopting the Department of Labor interpretation of FLSA's application to work "performed off-site," as codified at 29 C.F.R. § 785.12).

Plaintiffs' claim to overtime compensation under the FLSA can be divided into two broad categories of activities. First, plaintiffs seek compensation for the time they spend commuting to and from work with files needed for forthcoming inspections. Second, plaintiffs argue that they should also be compensated for time at home engaged in activities that arguably constitute "work" for purposes of the FLSA, such as reviewing files in anticipation of an inspection. I will discuss each of these categories in turn.

## A. Commuting Time

The Second Circuit addressed the scope of the Portal–to–Portal Act in *New York City Transit Auth.* There, the U.S. Department of Labor ("DOL") sued the New York City Transit Authority ("NYCTA") for overtime compensation under the FLSA on behalf of New York City Police Department officers assigned to a canine unit. 45 F.3d at 647. The DOL argued—

and the district court agreed—that the officers spent their entire commute "feeding, caring for, and walking the dogs, maintaining a relationship with them, and transporting them."[1] *Id.* at 649. The DOL argued that all of these activities should be considered "principal activities" of the police officers' employment, and thus outside the reach of the PPA. *Id.* The NYCTA asserted that the only principal activity of the officers was patrolling the subways with their dogs, and everything else should be deemed non-compensable preliminary or postliminary activities. *Id.*

Rejecting both interpretations of the Portal–to–Portal Act, the Second Circuit held that the "mere presence of a dog does not make the commute compensable." *Id.* at 652. However, the panel also recognized that the officers' commutes would occasionally be interrupted by "true dog-care work", such as feeding, training, walking or cleaning up after the officers' dogs. *Id.* Such activity did not categorically fall within either of the two section 254(a) exclusions in the PPA and thus might be compensable under the FLSA. *Id.* However, the Second Circuit held that this activity was de minimis. *Id.* at 653 (citing *Anderson,* 328 U.S. at 680, 66 S.Ct. 1187). Thus, the panel reversed the district court and directed that judgment be entered in favor of NYCTA. *Id.*

In a subsequent case, the Second Circuit addressed the question of what constituted "traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform" for purposes of FLSA claims. *Kavanagh,* 192 F.3d at 272 (quoting 29 U.S.C. § 254(a)). The Department of La-

bor had issued a regulation specifically providing that "ordinary commuting" was not compensable because "normal travel from home to work is not worktime." *Id.* (quoting 29 C.F.R. § 785.35). Moreover, "[t]his is true whether [the employee] works at a fixed location or at different job sites." *Id.* The plaintiff urged the Second Circuit to reject the agency's interpretation and instead adopt an objective standard for the term "normal travel" based upon reasonableness. *Id.* The court instead held that "normal travel" referred to the "time normally spent by a specific employee traveling to work" and thus is subjectively defined by "what is usual within the confines of a particular employment relationship." *Id.* (deferring to the agency interpretation under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

■ With these legal principles in mind, I examine the facts concerning the safe keeping and transportation of files to and from home in a light most favorable to plaintiffs. Plaintiffs testified that carrying the briefcases to and from work affected their commutes in varying ways. Plaintiff Singh claims that carrying a briefcase caused him occasionally to miss his subway train in Queens, and thus he needed to allow himself an extra 30 to 40 minutes to travel each direction. (Singh Dep. at 91) Plaintiff Singh testified that he would sometimes take the train in the opposite direction in order to get on one heading toward Manhattan with fewer people and thus more space for his briefcase. (Singh Dep. at 91) Plaintiff Joseph testified that carrying the briefcase slowed down his

---

**1.** The parties settled certain claims earlier in the litigation, such as the issue of whether the officers should be compensated for time at home spent caring for their dogs. *Reich v. New York City Transit Auth.,* 45 F.3d 646, 647 (2d Cir.1995). The NYCTA amended its col-

lective bargaining agreement with the officers' union to compensate the officers for these activities. *Id.* As a result, the only issue presented to the Second Circuit was whether the officers' commute time was compensable. *Id.* at 647–48.

walk to the nearest public transportation station by "give or take" ten minutes. (Joseph Dep. at 58) Plaintiffs Matthews and Shah stated that carrying the briefcase occasionally caused them to miss their bus or train, although they could not specify how often this occurred. (Matthews Dep. at 93–94; Shah Dep. at 41) The remaining plaintiffs simply testified that the briefcases slowed down the time they spent walking to public transportation or caused them "inconvenience". (Patil Dep. at 64–65; Shah Dep. at 42–43; Robeny Dep. at 79)

The plaintiffs acknowledged in their depositions that carrying the briefcases did not change the distance, method, duration or manner of their commute in any way after they completed their walk to a public transportation station or their own vehicle. (Patil Dep. at 71–72; Shah Dep. at 48; Joseph Dep. at 61; Robeny Dep. at 79) Nor do any of the plaintiffs contend in their briefs that they were engaged in any other workrelated tasks during their commutes. Even accepting as true that bringing the files to the site inspections was necessary for plaintiffs to perform their jobs, that fact without more does not make this activity "integral and indispensable" to the principal activity of the inspections under *Steiner,* 350 U.S. at 247, 76 S.Ct. 330. *See IBP,* — U.S. —, —, 126 S.Ct. 514, 527, 163 L.Ed.2d 288. Like walking from the factory gate to a workstation or waiting to don protective gear, carrying a briefcase is the kind of preshift activity that the Portal–to–Portal Act excludes from the FLSA.

Unlike a dog that might interrupt a commute with unanticipated behavior or bodily needs, a briefcase containing various files does not ordinarily demand attention from its human carrier. Just as the Second Circuit concluded that the "mere presence of a dog" with the officer did not transform the otherwise non-compensable

commute into compensable work, so this Court concludes that the mere presence of a briefcase during the plaintiffs' commutes does not make that time compensable. *See New York City Transit Auth.,* 45 F.3d at 652. Moreover, the Second Circuit has adopted a subjective, facts-specific approach to the question of what constitutes "ordinary commuting time". *See Kavanagh,* 192 F.3d at 272. In this particular employment relationship, the time that plaintiffs spend in their cars or on public transportation on their way to and from work is ordinary commuting time and thus not compensable under the FLSA.

■ The plaintiffs also claim that carrying the briefcases and files prolonged their commuting time beyond what was normal for their jobs. Accordingly, this Court will consider whether this time should be compensable under the FLSA or considered de minimis under *Anderson,* 328 U.S. at 680, 66 S.Ct. 1187. In *New York City Transit Auth.,* the Second Circuit adopted three factors to determine whether a given activity should be treated as de minimis: "(1) the practical administrative difficulty of recording the additional time; (2) the size of the claim in the aggregate; and (3) whether 'the claimants performed the work on a regular basis.'" 45 F.3d at 652 (citing *Lindow v. United States,* 738 F.2d 1057 (9th Cir.1984)). The Second Circuit applied those factors to those occasions on which the dogs actually interrupted the officers' commutes with their bodily needs or canine misbehavior. In doing so, the panel concluded that the occasions were infrequent and amounted only to a "tiny amount of aggregate time". *Id.* at 653. Given the administrative difficulty of "establishing a reliable system for recording the time spent in such care during commutes," the Second Circuit held that this "additional compensable work" was de minimis. *Id.* Other circuits have since

reached the same result on virtually identical facts. *See, e.g., Aiken v. City of Memphis,* 190 F.3d 753 (6th Cir.1999), *cert. denied,* 528 U.S. 1157, 120 S.Ct. 1164, 145 L.Ed.2d 1075 (2000) (involving police dogs); *Bobo v. United States,* 136 F.3d 1465, 1468 (Fed.Cir.1998) (involving dogs assigned to INS agents); *Rudolph v. Metro. Airports Comm'n,* 103 F.3d 677 (8th Cir.1996) (involving dogs assigned to airport security agents).

In contrast, the Second Circuit more recently reversed the grant of summary judgment in favor of an employer on the grounds, *inter alia,* that a radiological technician's regular arrival at work fifteen minutes early to turn on, warm up and test an x-ray processing machine, pull client files and prepare and perform certain pre-testing procedures was not de minimis. *See Kosakow v. New Rochelle Radiology Assocs.,* 274 F.3d 706, 715–19 (2d Cir. 2001). Applying the *New York City Transit Auth.* factors, the Second Circuit concluded that the plaintiff had come forward with evidence that she performed this additional work every day, and, when multiplied by the total number of work days, this work would be a significant amount in the aggregate. *Id.* (citing *New York City Transit Auth.,* 45 F.3d at 652–53). Furthermore, it would be administratively easy for the defendant to monitor and record the work at issue in *Kosakow* because it occurred at the workplace. *Id.*

Like the police dogs in *New York City Transit Auth.,* the effect of the briefcases on plaintiffs' commute varies widely. 45 F.3d at 648 n. 3 (noting that testimony varied from no stops during the commute for dog-related problems in the previous year to twenty stops per year). This variety of extra time spent carrying briefcases—and subtracting whatever time would have been spent in non-compensable "ordinary commuting"—would create substantial administrative difficulty for defendant

in monitoring and recording such activity. *See Kavanagh,* 192 F.3d at 272 (holding that "ordinary commuting" does not merit compensation under FLSA). While plaintiffs had to commute every day to and from work, their testimony does not demonstrate that carrying these briefcases regularly extended their commutes by any specific, minimum amount of time. *Compare Kosakow,* 274 F.3d at 715–19. A reasonable fact finder would be left to speculate whether the idiosyncratic variances in an individual's commuting time amounted, in the aggregate, to a sufficient amount of time to warrant relief under the FLSA. *But see Hernandez v. Keane,* 341 F.3d 137, 143 (2d Cir.2003), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005) ("The jury's role as the finder of fact does not entitle it to return a verdict based only on confusion, speculation or prejudice. . . ."). Applying the factors adopted by the Second Circuit in *New York City Transit Auth.* and viewing the facts most favorably to plaintiffs, I conclude that plaintiffs' additional commuting time associated with carrying the briefcases is de minimis as a matter of law.

No reasonable jury could find in plaintiffs' favor on their FLSA claim for overtime compensation as it pertains to their commuting time, and defendant is entitled to summary judgment in its favor.

B. Administrative Tasks Performed While Off–Duty

Plaintiffs argue that their employer has not provided them with sufficient time to complete various administrative tasks associated with their jobs, and they have come forward with evidence that they complete such paperwork at home. (Gittlitz Dep. at 55–62; Brugger Dep. at 13; Singh Aff. ¶ 13) For summary judgment purposes, defendant does not dispute that such activities are performed. (Def. Mem.

of Law in Opp'n at 7–8) Nor does defendant assert that such activity is not a "principal activity" within the meaning of the FLSA. (Def. Mem. of Law at 17; Def. Reply Mem. of Law at 7–8; Def Mem. of Law in Opp'n at 7–8) Rather, the parties disagree about whether defendant authorized such activity and, if not, the effect of the lack of such authorization.

In *Holzapfel,* the Second Circuit addressed the issue of an employer's liability for unauthorized overtime actually worked by an employee. 145 F.3d at 516. Like the police officers in *New York City Transit Auth.,* the plaintiff in *Holzapfel* trained and cared for a dog assigned to his department's canine unit. *Id.* at 519. The plaintiff was told that the police department could not pay him for time he spent on the training and care of the dog in excess of the two hours of overtime provided in department policy. *Id.* at 520. The Second Circuit noted that the plaintiff was never told to limit his off-duty activities to only those two hours. *Id.*

At trial, the district court instructed the jury to determine whether the plaintiff had performed overtime work—in excess of the compensated two hours per week—that was "reasonably necessary to fulfill his duties" and "could not reasonably be performed" within the allotted time. *Id.* at 520. The Second Circuit reversed and remanded for a new trial because the district court's jury instructions erroneously incorporated a "reasonableness requirement" into the FLSA definition of "work". *Id.* at 523–24 (articulating the proper approach).

■ In this case, after conducting discovery, plaintiffs have come forward with evidence from which a reasonable jury could find that plaintiffs performed overtime work during their off-duty hours without compensation. In their depositions, several plaintiffs testified under oath that they performed work at home because there was insufficient time during their workday to prepare for and complete all inspection paperwork. (Matthews Dep. at 33, 68, 140; Shah Dep. at 72–75; Robeny Dep. at 24–25, 40) In addition, plaintiffs have provided this Court with affidavits setting forth their experiences of working at home. (Singh Aff. ¶ 13; Matthews Aff. ¶¶ 7, 10) Both Henry Gittlitz, FAIU manager from 1988 to 2002, and Robert Brugger, Deputy Commissioner of the FDNY, testified that they were aware that plaintiffs asserted they were working at home. (Gittlitz Dep. at 57–62; Brugger Dep. at 13) Plaintiffs also provided copies of timesheets that were submitted to defendant indicating that plaintiffs were performing work at home. (Pl.Dep.Ex. 19) Plaintiffs have met their evidentiary burden to survive summary judgment on this issue. Several disputed factual questions exist pertaining to this aspect of the plaintiffs' FLSA claim, including how much time plaintiffs worked in their off-duty hours, whether defendant required that amount of time as part of the employment relationship, and whether defendant had actual or constructive knowledge of plaintiffs' alleged overtime. Such factual disputes may not be properly resolved on a motion for summary judgment and thus require a trial. Fed.R.Civ.P. 56(c).

■ The Second Circuit has emphasized that "an employee must be compensated for time she works outside of her scheduled shift, even if the employer did not ask that the employee work during that time, so long as the employer 'knows or has reason to believe that [the employee] is continuing to work' and that work was 'suffered or permitted' by the employer." *Kosakow,* 274 F.3d at 718 (quoting 29 C.F.R. 785.11). "Neither may overtime compensation be denied solely on the grounds that the employee could have completed his tasks during scheduled

hours, thereby avoiding the need for overtime altogether." *Holzapfel,* 145 F.3d at 522. Whether defendant "required" this work of plaintiffs is a factual question that should take into account defendant's policy and evidence of whatever guidance representatives of defendant provided to plaintiffs regarding overtime. *Id.* at 523. It is not appropriate for this Court to resolve these fact-intensive questions on a summary judgment motion. *See Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").

Nor may defendant argue that this alleged work, even if performed as plaintiffs assert, should be considered de minimis. Applying the factors from *New York City Transit Auth.,* plaintiffs have come forward with evidence from which a reasonable jury could conclude that they have performed work at home regularly and that it constituted a significant amount of time in the aggregate. 45 F.3d at 652. Similarly, the possible administrative difficulty in monitoring and recording this time is such as to preclude summary judgment in favor of either party. *See El v. Potter,* 2004 WL 2793166, *10–11 (S.D.N.Y. Dec. 6, 2004) (denying summary judgment to defendants, in part, on the grounds that plaintiffs had come forward with evidence from which a reasonable jury could conclude that it would not be administratively difficult to record and monitor their alleged overtime).

■ Finally, plaintiffs vaguely assert that the time spent at home safeguarding their briefcases is somehow deserving of compensation. Although in their memoranda submitted to this Court plaintiffs now limit their claim for overtime compensation under the FLSA to four hours, their second amended complaint alleged that defendant required plaintiffs to carry and

safeguard the briefcases "twenty-four hours a day[,] seven days a week." (Pl. Mem. of Law in Opp'n at 2; SAC ¶¶ 70–73) According to the implementing regulations of the FLSA, "time spent away from the employer's premises under conditions that are so circumscribed that they restrict the employee from effectively using the time for personal pursuits also constitutes compensable hours of work." 29 C.F.R. § 553.221(c). This regulation often applies to employees who are "on call". If such employees are not "confined to their homes or to any particular place, but may come and go as they please, provided that they leave word where they may be reached, the hours spent 'on call' are not considered as hours worked." 29 C.F.R § 778.223. Courts applying both regulations scrutinize the available evidence to determine how much freedom and flexibility characterized the plaintiff's life during these hours. *See, e.g., Ingram v. County of Bucks,* 144 F.3d 265, 268–70 (3rd Cir. 1998); *Nonnenmann v. City of New York,* 2004 WL 1119648, at *27 (S.D.N.Y. May 20, 2004). *Cf. Capasso v. Metro. Transp. Auth.,* 198 F.Supp.2d 452, 459–60 (S.D.N.Y.2002) (holding that requiring employees to remain at home on sick days did not constitute "work" for FLSA purposes). In *Ingram,* the Third Circuit denied overtime compensation, in part, because the plaintiffs received calls relatively infrequently and had a long time to respond to such a call. 144 F.3d at 268–70.

This argument for overtime compensation for safeguarding documents fails as a matter of law because plaintiffs here experienced an even lesser burden in keeping the files in their homes after work than did the plaintiffs in *Ingram.* Plaintiffs have come forward with no evidence from which a reasonable jury could conclude that defendant required them to keep the files on their person at all times. The most that plaintiffs have provided this Court is depo-

sition testimony and a letter from their supervisors that plaintiffs were simply responsible for these files. (Pl. 56.1 ¶¶ 30–33) Plaintiffs testified that they interpreted this guidance to mean that they could not visit singles bars, attend Broadway plays or relax at home with their children because their obligation to protect their files was paramount. (Singh Dep. at 110; Matthews Dep. at 112–13, 120; Robeny Dep. at 90) No reasonable jury could find, based upon these conclusory assertions, that the briefcases and the files they contained had to be within their immediate, physical control twenty-four hours per day, seven days per week. (SAC ¶ 71) As a result, a grant of summary judgment to defendant is appropriate on the claim for overtime compensation for those hours when plaintiffs are merely "safeguarding" the briefcase.

## II. State Retaliation Claim

Plaintiff Singh alone claims that defendant retaliated against him for informing the FDNY that he believed a violation of FLSA had occurred. (SAC ¶¶ 109–12) Singh argues that these alleged acts of retaliation violated section 75–b of the Civil Service Law of the State of New York. (SAC ¶ 110) This "whistleblower" statute provides:

> A public employer shall not dismiss or take other disciplinary or other adverse personnel action against a public employee regarding the employee's employment because the employee discloses to a governmental body information ... regarding a violation of a law, rule or regulation ... [that] the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action.

N.Y. C.L.S. Civ. § 75–b(2)(a). An employee bringing an action under this section may seek relief for back pay. *See* N.Y. C.L.S. Civ. § 75–b(3)(c); N.Y. Lab. Law § 740(5). However, this remedy is limited

because other provisions of section 75–b prohibit an employee from seeking relief in a "court of competent jurisdiction" if the employee is subject to a collective bargaining agreement that requires binding arbitration to resolve grievances. *See* N.Y. C.L.S. Civ. § 75–b(3)(b)–(c). *See also Munafo v. Metro. Transp. Auth.*, 2003 WL 21799913, *31 (E.D.N.Y. Jan. 22, 2003); *Obot v. New York State Dep't of Corr. Services*, 256 A.D.2d 1089, 1090, 682 N.Y.S.2d 767 (4th Dep't 1998), *lv. to appeal denied*, 689 N.Y.S.2d 596 (4th Dep't 1999).

■ Plaintiff Singh does not dispute that there is an agreement providing such an arbitration mechanism, but argues instead that defendant has somehow waived its right to submit the section 75–b retaliation claim to arbitration. (Pl. Mem. of Law in Opp'n at 24–25) In Singh's view, this Court should "estop" defendant from directing this Court's attention to section 75–b(3)(b) because defendant allegedly did not bring disciplinary charges against Singh and because defendant did not raise this issue in its motion to dismiss. However, plaintiff fails to cite any law in support of this proposition and instead rests its argument on cases pertaining to arbitration agreements and choice of forum. (Pl. Mem. of Law in Opp'n at 24–25) Unlike those cases, here the New York Legislature has determined that this specific cause of action should not exist when the employee has failed to utilize the mechanism of a collective bargaining agreement. It is not disputed that plaintiff Singh had this mechanism available to him, and thus his section 75–b retaliation claim fails. (Pl. Resp. to Def. 56.1 ¶ 24; Singh Dep. at 137–38, 141)

## III. Federal Retaliation Claim

Singh argues that the same acts that support his retaliation claim also give rise to a section 1983 claim asserting that de-

fendant, a state actor, deprived him of rights protected by the First Amendment to the U.S. Constitution. *See* 42 U.S.C. § 1983. (SAC ¶ 111) Plaintiff Singh has had the full opportunity through pretrial discovery to identify evidence to support the elements of a well-pleaded claim of First Amendment retaliation. *See generally Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("[The] simplified notice pleading standard [of the Federal Rules of Civil Procedure] relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.").

To survive a motion for summary judgment on this claim, plaintiff "must offer some tangible proof that 1)[his] speech was constitutionally protected; 2)[ ]he suffered an adverse employment action; and 3) a causal relationship between the two existed in that the speech was a substantial or motivating factor for the adverse employment action." *Burkybile v. Bd. of Educ.,* 411 F.3d 306, 313 (2d Cir.2005) (considering claim in appeal of a grant of summary judgment for defendants). For the second element, plaintiff Singh has arguably come forward with evidence from which a reasonable jury could conclude that he suffered an adverse employment action in the form of his 30–day suspension. *See Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir. 2002) (noting that "reprimand" constitutes an adverse employment action). However, defendant has moved for summary judgment on the ground that, as a matter of law, plaintiff Singh's speech was not protected under the First Amendment, thus not satisfying the first element. (Def. Mem. of Law at 18–19) I conclude that defendant has demonstrated that no reasonable fact finder could conclude, based upon the evidence in the record, that Singh's speech was protected, and therefore I grant defendant's motion on this ground.

"The inquiry into the protected status of speech is one of law, not fact." *Connick v. Myers,* 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). *See also Johnson v. Ganim,* 342 F.3d 105, 112 (2d Cir.2003) ("While this determination may be somewhat fact-intensive, it presents a question of law for the court to resolve."). Speech that touches on a matter of public concern is constitutionally protected. *See Connick,* 461 U.S. at 145, 103 S.Ct. 1684. Matters of public concern have political or social import to the community, but this does not include merely personal grievances. *Id.* at 145–46, 103 S.Ct. 1684. In the employment context, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147, 103 S.Ct. 1684. "Even as to an issue that could arguably be viewed as a matter of public concern, if the employee has raised the issue solely in order to further his own employment interest, his First Amendment right to comment on that issue is entitled to little weight...." *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1059 (2d Cir.1993), *cert. denied,* 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993).

▪ Viewing the evidence in a light most favorable to plaintiff, no reasonable jury could conclude that plaintiff Singh voiced his concerns to his supervisors in any capacity other than as an employee. His complaints pertained directly to his own work situation and what he perceived as the onerous requirement of carrying the briefcase and files. (Pl. 56.1 ¶ 20; Pl. Dep. Ex. 5–10, 12) Plaintiff Singh has come

forward with no evidence that the subject of these complaints extended to issues of "political or social import to the community," as required by *Connick*, 461 U.S. at 145–46, 103 S.Ct. 1684. *Compare Ayiloge v. City of New York*, 2002 WL 1424589, *9 (S.D.N.Y. June 28, 2002) (noting that plaintiff's complaint pertained to a Department of Homeless Services policy unrelated to his "personal working conditions" and thus constituted protected speech). Plaintiff Singh's accusations were not public at all, but rather took the form of written correspondence to specific supervisors whom he hoped would address his concerns. *Compare Burkybile*, 411 F.3d at 308–09 (noting that plaintiff's accusations about workplace conduct were made in police reports and public meetings). The fact that plaintiff Singh's employer was a public entity does not change this result. *See, e.g., Quinn v. Nassau County Police Dep't*, 53 F.Supp.2d 347, 361–62 (E.D.N.Y.1999) (holding that employee's filing a Notice of Claim against police department was intended "to further his own employment interest" in a "private employment dispute" and thus not protected speech).

## IV. State Free Speech Claim

Finally, Singh claims that the acts of defendant violated Article I, Section 8 of the New York State Constitution, which protects the freedom of speech. (SAC ¶ 112) The New York Court of Appeals has stated that the protections afforded the freedom of speech in the state constitution are broader than those in the federal constitution. *See People ex rel. Arcara v. Cloud Books, Inc.*, 68 N.Y.2d 553, 557, 510 N.Y.S.2d 844, 503 N.E.2d 492 (1986) ("New York has a long history and tradition of fostering freedom of expression, often tolerating and supporting works which in other States would be found offensive to the community.").

Singh asks this Court to imply a cause of action for such an alleged constitutional violation by extending *Brown v. State*, 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129 (1996) to free speech violations. (SAC ¶ 112) In *Brown*, the New York Court of Appeals held that the plaintiff class had stated an implied cause of action for damages against the State for violations of the equal protection clause and search and seizure provisions of the New York State Constitution. 89 N.Y.2d at 187–92, 652 N.Y.S.2d 223, 674 N.E.2d 1129. In doing so, the Court of Appeals relied on the reasoning of the U.S. Supreme Court in finding an analogous implied cause of action to redress federal constitutional violations by federal agents. *Id.* at 187–88, 652 N.Y.S.2d 223, 674 N.E.2d 1129 (citing *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)). In particular, the Court of Appeals recognized the importance of constitutional protections such as the freedom from unreasonable searches and seizures:

> If the remedy is not forthcoming from the political branches of government, then the courts must provide it by recognizing a damage remedy against the violators much the same as the courts earlier recognized and developed equitable remedies to enjoin unconstitutional actions. Implicit in this reasoning is the premise that the Constitution is a source of positive law, not merely a set of limitations on government.

*Id.* at 187, 652 N.Y.S.2d 223, 674 N.E.2d 1129. The plaintiffs in both *Bivens* and *Brown* effectively had no remedy available to them other than a cause of action that the judicial branch implied from the federal or state constitution. *See Bivens*, 403 U.S. at 395–96, 91 S.Ct. 1999 (noting the unavailability to plaintiffs who suffered constitutional violations by federal officers of remedies under section 1983 or in common law tort); *Brown*, 89 N.Y.2d at 191, 652 N.Y.S.2d 223, 674 N.E.2d 1129 (noting

that plaintiffs who could cast their claim in terms of a common-law tort could seek money damages, while "claimants, who suffered similar indignities, must go remediless because the duty violated was spelled out in the State Constitution").

The New York Court of Appeals has emphasized that *Brown* was a narrow decision. In *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 83–84, 735 N.Y.S.2d 868, 761 N.E.2d 560 (2001), the New York Court of Appeals refused to recognize a state constitutional tort remedy for a plaintiff seeking damages several years after a different court had concluded that she had been the subject of an unlawful search and released her from prison. *Id.* at 81–82, 735 N.Y.S.2d 868, 761 N.E.2d 560. The Court stated that *Brown* rested on "two interests: the private interest that citizens harmed by constitutional violations have an avenue of redress, and the public interest be deterred." *Id.* at 83, 735 N.Y.S.2d 868, 761 N.E.2d 560. There had been no prosecution of the plaintiff class in *Brown*, so there was neither injunctive relief nor the possible suppression of evidence available to them. *Id.* at 83–84, 735 N.Y.S.2d 868, 761 N.E.2d 560 (discussing *Brown*, 89 N.Y.2d at 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129). As a result, there had also been no judicial action to deter future wrongdoing by law enforcement. *Id.* at 84, 735 N.Y.S.2d 868, 761 N.E.2d 560. In contrast, the plaintiff in *Martinez* had already pursued an available avenue of redress and succeeded in getting her conviction reversed. *Id.* The Court of Appeals concluded that such reversal adequately served the deterrence objective as well. *Id.*

█ Like the plaintiff in *Martinez*, public employees like Singh who claim that the state violated their free speech rights have an effective avenue of redress available to them under either N.Y. C.L.S. Civ. § 75–b or the arbitration mechanisms contained in their collective bargaining agreement. As discussed above, Singh may not rely upon section 75–b remedies because his collective bargaining agreement provides a valid alternative of a grievance mechanism. *See* N.Y. C.L.S. Civ. § 75–b(3)(b)–(c) (restricting section 75–b remedies to public employees lacking such an alternative). *See also Munafo*, 2003 WL 21799913, at *31 (denying section 75–b relief because plaintiff had an arbitration mechanism in a collective bargaining agreement); *Obot*, 256 A.D.2d at 1090, 682 N.Y.S.2d 767 (same). Singh even made use of this mechanism initially, although Singh's union did not file a formal grievance on his behalf. (Pl. 56.1 ¶¶ 84–85; Pl. Dep. Ex. 33, 38; Singh Dep. at 137–38, 141) Unlike the plaintiffs in *Brown* and *Bivens*, Singh has a valid remedy available to him—the grievance mechanism—to redress his alleged injury. Recognition of a state constitutional tort is not necessary to afford Singh a remedy. Other courts have similarly rejected claims for money damages based on state constitutional violations after *Brown* where the plaintiff had an alternative remedy recognized in state or federal statute. *See, e.g., Bullard v. State*, 307 A.D.2d 676, 678–79, 763 N.Y.S.2d 371 (3d Dep't 2003) (rejecting free speech claim under *Brown* where plaintiff had alternative of an Article 78 proceeding); *Hous. Works. Inc. v. Turner*, 179 F.Supp.2d 177, 206–08 (S.D.N.Y.2001), *aff'd* 56 Fed.Appx. 530 (2d Cir.2003) (rejecting free speech claim under *Brown* where plaintiff had alternative of section 1983). Consistent with those decisions, this Court will not extend *Brown* to alleged free speech violations where the plaintiff has an alternative remedy available to him under his collective bargaining agreement. In enacting section 75–b, the New York Legislature has demonstrated its preference for public employees to use

this mechanism instead of seeking a judicial remedy.

*CONCLUSION*

For the reasons outlined above, defendant's motion for summary judgment is denied in part and granted in part. The plaintiffs' motion for summary judgment is denied.

SO ORDERED.